UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DR. ROBERT ANDERSON,

        Plaintiff,

    v.                                                          Case No. 19-C-521

CITY OF ALGOMA, et al.,

        Defendants.

---

## DECISION AND ORDER

Plaintiff Robert Anderson, M.D., brought this 42 U.S.C. § 1983 action against Defendants City of Algoma, the Algoma Medical Center and Long-Term Care Unit (ALTCU), Jean Marsh, and Janelle Kettering, alleging that they violated his right to due process by making false statements suggesting that he abused his ALTCU patients. He also asserts claims for intentional interference with professional relationships, conspiracy, and defamation under Wisconsin law. The court has jurisdiction over Plaintiff's § 1983 claim under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. This case is before the court on Defendants' motion for summary judgment. For the following reasons, Defendants' motion will be granted with respect to the federal claim, Plaintiff's state law claims will be dismissed without prejudice, and the case will be dismissed.

## BACKGROUND

The City of Algoma is a municipality and governmental entity located in Kewaunee County, Wisconsin. Defs.' Proposed Findings of Fact (DPFOF) ¶ 1, Dkt. No. 37. The City owns and operates the ALTCU, a skilled nursing and community-based residential facility. *Id.* ¶ 3.

Algoma's City Council established a board to oversee ALTCU operations. *Id.* ¶ 4. The ALTCU Administrator, Jean Marsh, oversaw the day-to-day operations of the ALTCU, and the director of nursing, Janelle Kettering, developed and maintained standard nursing practices and policies for the facility. *Id.* ¶¶ 7–8. Marsh appeared at ALTCU Board and City Council meetings to give updates regarding the status of the facility. *Id.* ¶ 40.

The City does not employ medical doctors at the ALTCU and entered into a service agreement with Bellin Health Systems to fill these roles. *Id.* ¶ 16. From April 2003 until October 2014, the City contracted with Plaintiff, who was employed by Bellin, to act as the ALTCU's medical director. *Id.* ¶ 17. In 2014, the City bid out the medical director position. Bellin submitted a bid and was selected by the City to provide a medical director, resulting in Plaintiff serving a two-year term as the ALTCU's medical director. *Id.* ¶ 18. In 2016, the City solicited bids for the medical director position, and Door County Medical Center was chosen to provide the medical director. *Id.* ¶ 19. Plaintiff nevertheless continued to provide treatment to patients at the ALTCU.

In November 2016, the Centers for Medicare and Medicaid Services issued the "Mega Rule," which made major changes to the best practices for resident care at facilities that participate in the Medicare and Medicaid programs. *Id.* ¶ 22. The Mega Rule requires facilities like the ALTCU to develop an Infection Prevention and Control Program (IPCP) to target infections and unnecessary hospital readmissions. *Id.* ¶¶ 23–24. State surveyors performed audits of the ALTCU on behalf of the Wisconsin Department of Health Services on September 28, 2017. *Id.* ¶ 29. The surveyors notified Marsh that many of the ALTCU's policies and procedures were not up to date and were not in compliance with the Mega Rule requirements. *Id.* ¶ 30. They noted that the frequent prescription of antibiotics demonstrated that the ALTCU had an unreasonable infection rate and that they would recommend federal penalties. *Id.* ¶¶ 31–32. Marsh and Kettering

reviewed the medical records of patients identified by the audit, and Marsh explained to the survey team that many of these patients were not ultimately found to have infections but were prescribed antibiotics in anticipation of a respiratory pneumonia diagnosis. *Id.* ¶ 33. State surveyors performed a series of revisits to the facility and ultimately found that the changes ALTCU implemented brought the facility into substantial compliance with the Mega Rule requirements. *Id.* ¶ 35.

To become compliant with the Mega Rule, the ALTCU implemented the "McGeer Criteria," which sets forth the specific criteria that must be present before an antibiotic is prescribed. *Id.* ¶ 36. Kettering discussed the McGeer Criteria with the doctors who were treating ALTCU residents at the time, including Plaintiff and Dr. Terry Reisner, and offered them training regarding the new policies. *Id.* ¶ 38. Defendants contend that, while Dr. Reisner appeared receptive to the new policies and procedures, Plaintiff was less willing to collaborate with the infection prevention specialist under the new policies. *Id.* ¶¶ 45–46. Marsh received complaints relating to Plaintiff not following the new policies and procedures. She emailed the medical director, Dr. Reisner, on January 12, 2018, to notify him of the complaints and asked if he would meet with Plaintiff. *Id.* ¶ 47. Dr. Reisner spoke with Plaintiff after the audit about the new policies and procedures, and he emailed Marsh on January 12, 2018, about the meeting. *Id.* ¶ 48. After the meeting, Kettering contends that she noticed no change in Plaintiff's reluctance to follow the new policies. DPFOF ¶ 49. Plaintiff asserts that Kettering is not aware of any instance in which he prescribed an antibiotic and failed to provide a reason for it. Pl.'s Resp. to DPFOF ¶ 49, Dkt. No. 40. Marsh discussed Plaintiff's conduct with the ALTCU board in May 2018 during a closed session. Pl.'s Proposed Findings of Fact (PPFOF) ¶ 8, Dkt. No. 39.

Bellin organized a meeting with Marsh and Kettering to discuss the ALTCU's concerns about Plaintiff. DPFOF ¶ 58. Marsh never discussed any of her concerns with Plaintiff directly. PPFOF ¶ 54. Instead, she compiled a list of issues and concerns that she had received regarding Plaintiff and provided Bellin with a copy of the list at the June 19, 2018 meeting. DPFOF ¶ 59. Bellin initiated a peer review in response to the ALTCU's concerns discussed at the meeting. During this time, Bellin directed Dr. Donald Hartig to treat Plaintiff's patients residing at the ALTCU. *Id.* ¶ 60. Dr. Hartig reported to Bellin doctors that he did not find any problems with Plaintiff's care of his patients. *Id.* ¶ 62. Marsh expected that Dr. Hartig would find nothing wrong with Plaintiff's conduct, and after the June 2018 meeting, Kettering did not have further concerns about Plaintiff's treatment of his patients. PPFOF ¶¶ 41, 50.

Plaintiff believed there was a movement to remove him from treating patients at ALTCU. *Id.* ¶¶ 66–67. He asserts that Marsh and Kettering made numerous false statements to the ALTCU Board and Bellin, including that he refused to follow the antibiotic stewardship protocol; he was responsible for the survey deficiency regarding antibiotic protocol; he badmouthed the facility; his reduction of diuretics for residents contributed to a survey deficiency; he misdiagnosed and improperly treated patients; he ordered unnecessary tests for residents; and he did not and would not provide timely and compassionate response to on-call needs. On January 10, 2019, Marsh sent the Vice President of Primary Care for Bellin, Amy Dettman, an email expressing concern that Plaintiff would be on call and requesting assurance that the residents would receive a "timely and compassionate response to on-call needs." *Id.* ¶ 81. Dettman concluded from the email that Marsh did not want to have Plaintiff on call again and observed that the relationship between the ALTCU and Plaintiff was broken and irreparable. *Id.* ¶ 84. On March 4, 2019, Dettman advised Marsh that Plaintiff would no longer be "on call" for the facility. DPFOF ¶¶ 73, 85. Bellin and Plaintiff

4

ultimately agreed that it would not be in his best interests to return to the ALTCU and treat patients there. PPFOF ¶ 68.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences that favor them in the light most favorable to the nonmoving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. Due Process Claim

Plaintiff asserts that Defendants deprived him of liberty without due process of law. The Fourteenth Amendment prohibits a state from depriving a person of "life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks and citations omitted). To prevail

5

on a procedural due process claim under the Fourteenth Amendment, a plaintiff must show that the government "'deprived him of a constitutionally protected liberty or property interest without due process of law.'" *Hinkle v. White*, 793 F.3d 764, 767 (7th Cir. 2015) (quoting *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005)).

Plaintiff claims he was deprived of liberty interests in his good name and reputation and in his ability to treat his patients because Defendants defamed him by concocting a long list of false claims that he was abusing his patients. It is well established that a plaintiff cannot bring a due process claim based on reputational harm alone stemming from defamatory statements. *See Roake v. Forest Preserve District of Cook Cty.*, 849 F.3d 342, 347 (7th Cir. 2017) ("Mere injury to reputation, even if it seriously impairs one's future employment prospects, is not a constitutionally protected liberty or property interest under the due process clause." (citations omitted)); *see also Paul v. Davis*, 424 U.S. 693, 711–12 (1976) (holding that "interest in reputation alone" is not cognizable under the Due Process Clause). Instead, to assert a due process claim based on reputational harm, a plaintiff must show "stigma plus," that is, "the alteration of legal status such as governmental deprivation of a right previously held, which, combined with the injury resulting from the defamation, justif[ies] the invocation of procedural safeguards." *Hinkle*, 793 F.3d at 768; *see also Roake*, 849 F.3d at 347 ("[A] plaintiff must show that the government distinctly altered his legal status in addition to tarnishing his good name." (citation omitted)). Courts have found that the government can distinctly alter a plaintiff's legal status through "discharge, failure to rehire, failure to grant tenure, or similar adverse employment action." *Bryant v. Gardner*, 545 F. Supp. 2d 791, 798 (N.D. Ill. 2008) (citing *Paul*, 424 U.S. at 708–10; *Brown v. City of Michigan City, Indiana*, 462 F.3d 720, 730 (7th Cir. 2006)).

Although Plaintiff maintains he has suffered an injury to his reputation, he has not shown that Defendants did anything to change or alter his legal status. After Plaintiff decided it would not be in his best interest to treat patients at the ALTCU, he remained a Bellin employee. Plaintiff does not dispute that he was not terminated from his position with Bellin and was not precluded from working as a physician. To the extent Plaintiff asserts a liberty interest in treating his patients at the ALTCU, no such interest exists. The Seventh Circuit has recognized that "[t]he concept of liberty protected by the due process clause has long included occupational liberty—'the liberty to follow a trade, profession, or other calling.'" *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992) (quoting *Lawson v. Sheriff of Tippecanoe Cty.*, 725 F.2d 1136, 1138 (7th Cir. 1984)). But "it is the liberty to pursue a *calling or occupation*, and not the right to a specific job, that is secured by the Fourteenth Amendment.'" *Hinkle*, 793 F.3d at 767 (quoting *Wroblewski*, 965 F.2d at 455). Though Plaintiff has an occupational liberty in pursuing a calling as a medical doctor, he does not have a liberty interest in specifically treating Bellin patients residing at the ALTCU. Plaintiff has not established that Defendants distinctly altered his legal status and thus has not established that Defendants deprived him of liberty without due process of law. Accordingly, Defendants' motion for summary judgment will be granted on this claim.

**B. State Law Claims**

Plaintiff has also alleged state law claims against Defendants. Generally, when federal claims drop out of a case, federal courts decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3); *see Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). The Seventh Circuit has described a "sensible presumption that if the federal claims drop out *before*

7

*trial*, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). The court follows this presumption and declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Accordingly, Plaintiff's state law claims will be dismissed without prejudice so that they may be pursued in a state forum.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Dkt. No. 28) will be **GRANTED** as to the federal claim and that claim is dismissed. Plaintiff's state law claims are dismissed without prejudice. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 7th day of July, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge